# IN THE SUPREME COURT OF CALIFORNIA

HILL RHF HOUSING PARTNERS, L.P., et al.,
Plaintiffs and Appellants,

v.

CITY OF LOS ANGELES et al.,
Defendants and Respondents.

MESA RHF PARTNERS L.P.,
Plaintiff and Appellant,

v.

CITY OF LOS ANGELES et al.,
Defendants and Respondents.

S263734

Second Appellate District, Division One
B295181, B295315

Los Angeles County Superior Court
BS170127, BS170352

December 20, 2021

Chief Justice Cantil-Sakauye authored the opinion of the Court, in which Justices Corrigan, Liu, Kruger, Groban, Jenkins, and Haller, J.* concurred.

---

\*    Associate Justice of the Court of Appeal, Fourth Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

HILL RHF HOUSING PARTNERS, L.P. v.
CITY OF LOS ANGELES

S263734


Opinion of the Court by Cantil-Sakauye, C. J.


State law provides for the formation of business improvement districts, or BIDs, through which services, activities, and improvements may be funded by assessments imposed on benefitted businesses or properties. When a BID is subsidized by assessments upon real property, these levies must comply with the Right to Vote on Taxes Act, an initiative measure more commonly known as Proposition 218. The question before us is whether courts will entertain arguments that a BID's assessment scheme violates certain provisions of Proposition 218 when raised by a party who did not articulate these objections at the noticed public hearing at which protests regarding a BID are to be considered by lawmakers. (Cal. Const., art. XIII D, § 4, subd. (e); see also Gov. Code, § 53753, subd. (d).)[1]

In proceedings below, the Court of Appeal concluded that petitioners' failure to present their objections to BIDs at the appropriate public hearings meant they had not exhausted their extrajudicial remedies, a lapse that prevented the court from deciding petitioners' claims on the merits. We disagree. The opportunity to comment on a proposed BID does not involve the sort of "clearly defined machinery for the submission, evaluation

---

[1]     Unspecified references to "article" in this opinion refer to articles of the California Constitution.

1

and resolution of complaints by aggrieved parties" (*Rosenfield v. Malcolm* (1967) 65 Cal.2d 559, 566 (*Rosenfield*)) that has allowed us to infer an exhaustion requirement in other contexts. Furthermore, the Court of Appeal's exhaustion analysis does not find support in the policy rationales that inform the exhaustion doctrine nor in the intentions behind Proposition 218. These considerations lead us to hold that petitioners need not have raised their specific objections to the BIDs at the public hearings in order to subsequently advance these arguments in court. We therefore reverse the judgment of the Court of Appeal.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Petitioners Mesa RHF Partners L.P. (Mesa), Hill RHF Housing Partners, L.P. (Hill), and Olive RHF Housing Partners, L.P. (Olive) (collectively, petitioners) are nonprofit providers of housing and services to low-income seniors. Mesa owns real property, known as Harbor Tower, in San Pedro. Hill owns a property known as Angelus Plaza and Olive owns another property, Angelus Plaza North, in downtown Los Angeles. Harbor Tower is within the boundaries of the San Pedro Historic Waterfront Property and Business Improvement District (the San Pedro BID), and the Angelus Plaza and Angelus Plaza North properties are within the Downtown Center Business Improvement District (the Downtown Center BID).

These two BIDs were created pursuant to the Property and Business Improvement District Law of 1994 (Sts. & Hy. Code, § 36600 et seq., added by Stats. 1994, ch. 897, § 1; hereinafter referred to as the PBID Law). The San Pedro BID was originally established in 2012; the Downtown Center BID in 1998. In 2012, petitioners brought legal challenges against these BIDs. Those disputes were resolved through settlement

agreements, reached in 2013, in which it was determined that the City of Los Angeles would reimburse petitioners for their BID assessment payments.

In 2017 it was proposed that the San Pedro and Downtown Center BIDs be renewed for ten-year terms. Each proposal engaged the process for approving a BID, as set out in the PBID Law, Proposition 218, and the Proposition 218 Omnibus Implementation Act (Gov. Code, § 53750 et seq.; hereinafter referred to as the Implementation Act). As part of this process, the Los Angeles City Council (hereinafter sometimes referred to as the City Council) adopted two ordinances, one for each BID, expressing an intent to consider the establishment of the BID. Each of these ordinances adopted and approved a detailed management district plan and associated engineer's report for the relevant BID, provided a general description of the BID's boundaries, gave the total projected assessment for the BID over its ten-year term as well as for its first year, identified the number of assessed parcels in the proposed BID (804 parcels owned by 270 stakeholders for the San Pedro BID; 2,865 parcels owned by 1,710 stakeholders for the Downtown Center BID), and summarized the improvements and activities to be undertaken through the BID. For each BID, the appropriate ordinance also announced the date, time, and place of a public hearing before the City Council at which, per the ordinances, "all interested persons will be permitted to present written or oral testimony, and the City Council will consider all objections or protests to the proposed assessment" used to fund the BID.

Mesa received written notice of the public hearing before the Los Angeles City Council on the San Pedro BID; Hill and Olive received notice of the public hearing before the City Council on the Downtown Center BID. Each notice stated that

at the designated hearing, "the City Council will hear all interested persons for or against establishment of the District, the extent of the District, and the furnishing of specified types of improvements or activities and may correct minor defects in the proceedings." The notices explained that no assessment for the BID would be imposed if there was a majority protest. Each notice was accompanied by a ballot for voting on the BID, along with instructions regarding how to return it. Also enclosed with each notice was a summary of the BID's management district plan, containing information including the reasons for the assessment, a breakdown of the BID's proposed activities, the total amount of the assessment chargeable to the district, the basis upon which the assessment had been calculated, a description of the BID's boundaries, and a list of the parcels included in the BID.

Petitioners' authorized representative voted against the San Pedro BID and the Downtown Center BID. Petitioners did not raise any specific challenges to the BIDs at the public hearings before the City Council. Nor is there any indication in the administrative records that any legal arguments against the BIDs were presented by anyone else at these sessions. Meanwhile, on the same day as the hearing on the San Pedro BID (which took place three weeks after the hearing on the Downtown Center BID), a City of Los Angeles representative advised petitioners' counsel that due to differences between the BIDs as formerly constituted and as renewed, the previously negotiated 2013 settlement agreements — which by their terms applied for so long as the earlier-established BIDs "continue[d] in [their] current formulation[s]" — were no longer in effect.

When all ballots were counted, petitioners were substantially outvoted; there was no majority protest against

either BID. Shortly after each tabulation, the City Council adopted an ordinance regarding the relevant BID, announcing in each instance that the City Council had "heard all testimony and received all evidence concerning the establishment of the District and desires to establish the District."

Petitioners then initiated two actions, each within the 30-day time frame prescribed by section 36633 of the Streets and Highways Code,[2] with Mesa challenging the San Pedro BID and Hill and Olive attacking the Downtown Center BID. The verified pleadings contain similar allegations, with each averring that the BID in question violates Proposition 218. Boiled down, petitioners assert that the assessments imposed for the BIDs contravene the initiative because they are premised on an incorrect and inadequately supported understanding of the "special" versus "general" benefits that will accrue from each BID's activities — treating as "special" what petitioners contend are in fact "general" benefits, a distinction that will be explained later in this opinion — and because the assessments imposed on petitioners exceed the reasonable cost of the proportional special benefits conferred on their parcels. Petitioners seek various forms of relief that would remove any obligation that they pay assessments for the BIDs.[3]

---

[2] This section of the PBID Law provides, "The validity of an assessment levied under this part shall not be contested in an action or proceeding unless the action or proceeding is commenced within 30 days after the resolution levying the assessment is adopted . . . ." (Sts. & Hy. Code, § 36633.)

[3] Both pleadings also allege two causes of action that petitioners did not pursue in proceedings below, and for that reason are no longer of concern to us. The first such claim asserted that the assessments for the San Pedro and Downtown

Petitioners allege in their pleadings that they exhausted their administrative remedies. Respondents (the City of Los Angeles and the San Pedro Property Owners Alliance in the action brought by Mesa; the City and the Downtown Center Business Improvement District Management Corporation in the action brought by Hill and Olive) disagree, asserting a failure to exhaust in their answers. At the hearing before the superior court on the petitions, the court opined that petitioners had satisfied whatever exhaustion requirement might apply to them by casting ballots against the BIDs. Consistent with this view, the court's order following the hearing did not discuss exhaustion. The order instead reached the merits of petitioners' claims, ultimately denying the petitions in full.

The Court of Appeal saw the exhaustion issue differently. It declined to address petitioners' claims on the merits because, the appellate court concluded, petitioners had failed to exhaust their extrajudicial remedies. (*Hill RHF Housing Partners, L.P. v. City of Los Angeles* (2020) 51 Cal.App.5th 621, 627 (*Hill RHF*).) Looking to our decision in *Williams & Fickett v. County of Fresno* (2017) 2 Cal.5th 1258 (*Williams & Fickett*) for guidance, the Court of Appeal reasoned that "[t]he PBID Law's

_____

Center BIDs violate section 36632, subdivision (a) of the Streets and Highways Code, which provides in relevant part that assessments levied on real property pursuant to the PBID Law "shall be levied on the basis of the estimated benefit to the real property within the property and business improvement district." Petitioners did not press this argument as a distinct theory in their briefing before the superior court or the Court of Appeal. The second claim, which was dismissed prior to the trial court's hearing on the petitions, sought declarations that the 2013 settlement agreements, including their reimbursement provisions, applied to the BIDs as renewed.

detailed administrative procedural requirements 'provide affirmative indications of the Legislature's desire' that agencies be allowed to consider in the first instance issues raised during [the BID approval] process. [Citation.] As in *Williams & Fickett*, we conclude that the procedure outlined in the PBID Law 'bespeaks a legislative determination that the [City] should, in the first instance, pass on' the questions Hill, Olive, and Mesa present in their petitions, 'or decide that it need not do so.'" (*Hill RHF*, at p. 632, quoting *Williams & Fickett*, at p. 1271.)

The Court of Appeal determined that with this framework in place, petitioners could not be heard to raise their arguments in court without first having presented these objections at the appropriate public hearing. (*Hill RHF*, *supra*, 51 Cal.App.5th at pp. 627, 634.) In reaching this result, the Court of Appeal rejected petitioners' assertion that they had exhausted their administrative remedies by voting against the BIDs. The court explained, "[e]xhaustion of administrative remedies in this context requires nothing more of a property owner than submitting a ballot opposing the assessment *and* presenting to the agency at the designated public hearing the specific reasons for its objection to the establishment of a BID in a manner the agency can consider and either incorporate into its decision or decline to act on." (*Id.*, at p. 634, italics added.)

We granted review.

## II. DISCUSSION

The discussion below begins by surveying the relevant provisions of Proposition 218, the PBID Law, and the Implementation Act. The analysis then turns to the exhaustion doctrine, explicating this rule before considering whether

petitioners had to present their specific objections to the BIDs at the appropriate public hearings for these arguments to later be heard on the merits in court. We conclude that petitioners were not required to take this step before instituting these actions.

### A. Constitutional and Statutory Framework

#### 1. Proposition 218

We have in prior decisions described the origins and aims of Proposition 218. This measure, "approved by voters in 1996, is one of a series of voter initiatives restricting the ability of state and local governments to impose taxes and fees. [Citation.] The first of these measures was Proposition 13, adopted in 1978, which limited ad valorem property taxes to 1 percent of a property's assessed valuation and limited annual increases in valuation to 2 percent without a change in ownership. [Citations.] To prevent local governments from increasing special taxes to offset restrictions on ad valorem property taxes, Proposition 13 prohibited counties, cities, and special districts from imposing special taxes without a two-thirds vote of the electorate. [Citations.] But local governments were able to circumvent Proposition 13's limitations by relying on *Knox v. City of Orland* (1992) 4 Cal.4th 132, 141 . . . , which held a 'special assessment' was not a 'special tax' within the meaning of Proposition 13. [Citation.] Consequently, without voter approval, local governments were able to increase rates for services by labeling them fees, charges, or assessments rather than taxes. [Citation.] [¶] To address these and related concerns, voters approved Proposition 218, known as the 'Right to Vote on Taxes Act,' which added articles XIII C and XIII D to the California Constitution. [Citation.] Article XIII C concerns voter approval for many types of local taxes other than property

taxes. Article XIII D addresses property-based taxes and fees. [¶] Article XIII D allows only four types of local property taxes: (1) an ad valorem tax, (2) a special tax, (3) an assessment, and (4) a property-related fee. (Art. XIII D, § 3, subd. (a).) Proposition 218 supplements Proposition 13's limitations on ad valorem and special taxes by placing similar restrictions on assessments and property-related fees." (*Plantier v. Ramona Municipal Water Dist.* (2019) 7 Cal.5th 372, 380–381, fn. omitted (*Plantier*).)

Section 4 of Proposition 218 (art. XIII D, § 4) is specifically concerned with assessments. Regarding these levies, Proposition 218 "was designed to: constrain local governments' ability to impose assessments; place extensive requirements on local governments charging assessments; shift the burden of demonstrating assessments' legality to local government; make it easier for taxpayers to win lawsuits; and limit the methods by which local governments exact revenue from taxpayers without their consent." (*Silicon Valley Taxpayers' Assn., Inc. v. Santa Clara County Open Space Authority* (2008) 44 Cal.4th 431, 448 (*Silicon Valley Taxpayers' Assn.*).)

Proposition 218 has both substantive and procedural ramifications for assessments. Substantively, it "restricts government's ability to impose assessments in several important ways. First, it tightens the definition of the two key findings necessary to support an assessment: special benefit and proportionality. An assessment can be imposed *only* for a 'special benefit' conferred on a particular property. (Art. XIII D, §§ 2, subd. (b), 4, subd. (a).) A special benefit is 'a particular and distinct benefit over and above general benefits conferred on real property located in the district or to the public at large.' (Art. XIII D, § 2, subd. (i).) The definition specifically provides

that '[g]eneral enhancement of property value does not constitute "special benefit." ' (*Ibid.*) Further, an assessment on any given parcel must be in proportion to the special benefit conferred on that parcel: 'No assessment shall be imposed on any parcel which exceeds the reasonable cost of the proportional special benefit conferred on that parcel.' (Art. XIII D, § 4, subd. (a).) . . . Because only special benefits are assessable, and public improvements often provide both general benefits to the community and special benefits to a particular property, the assessing agency must first 'separate the general benefits from the special benefits conferred on a parcel' and impose the assessment only for the special benefits. ([*Ibid.*].)" (*Silicon Valley Taxpayers' Assn., supra*, 44 Cal.4th at p. 443.)[4]

Procedurally, all assessments captured by Proposition 218 "shall be supported by a detailed engineer's report prepared by a registered," state-certified professional engineer. (Art. XIII D, § 4, subd. (b).) Also, before an assessment is imposed, "[t]he amount of the proposed assessment for each identified parcel shall be calculated and the record owner of each parcel shall be given written notice by mail of the proposed assessment, the total amount thereof chargeable to the entire district, the amount chargeable to the owner's particular parcel, the duration of the payments, the reason for the assessment and the basis upon which the amount of the proposed assessment was calculated, together with the date, time, and location of a public hearing on the proposed assessment." (*Id.*, subd. (c).) This hearing is to occur "not less than 45 days after mailing the notice

---

[4] For purposes of Proposition 218, an "agency" means "any county, city, city and county, including a charter city or county, any special district, or any other local or regional governmental entity." (Art. XIII C, § 1, subd. (b); art. XIII D, § 2, subd. (a).)

of the proposed assessment to record owners of each identified parcel." (*Id*., subd. (e).) "Each notice shall also include, in a conspicuous place thereon, a summary of the procedures applicable to the completion, return, and tabulation of" a ballot that is to be provided to the parcel owner, on which "the owner may indicate his or her name, reasonable identification of the parcel, and his or her support or opposition to the proposed assessment." (*Id*., subds. (c), (d).) At the public hearing on an assessment, "the agency shall consider all protests against the proposed assessment and tabulate the ballots." (*Id*., subd. (e).) An assessment shall not be imposed by an agency if there is a majority protest, which "exists if, upon the conclusion of the hearing, ballots submitted in opposition to the assessment exceed the ballots submitted in favor of the assessment." (*Ibid*.) "In tabulating the ballots, the ballots shall be weighted according to the proportional financial obligation of the affected property." (*Ibid*.)

Proposition 218 also includes a provision addressing judicial review of assessments. "[T]o make it more difficult for an assessment to be validated in a court proceeding" (*Silicon Valley Taxpayers' Assn.*, *supra*, 44 Cal.4th at p. 445), the measure provides that "[i]n any legal action contesting the validity of any assessment, the burden shall be on the agency to demonstrate that the property or properties in question receive a special benefit over and above the benefits conferred on the public at large and that the amount of any contested assessment is proportional to, and no greater than, the benefits conferred on the property or properties in question." (Art. XIII D, § 4, subd. (f).) We have determined that, consistent with the proposition's stated intent that its provisions "shall be liberally construed to effectuate its purposes of limiting local government revenue and

enhancing taxpayer consent" (Ballot Pamp., Gen. Elec. (Nov. 5, 1996) text of Prop. 218, § 5, p. 109) and other indicia of the measure's purpose found within relevant ballot materials (e.g., *id.*, analysis of Prop. 218 by Legis. Analyst, p. 73 ["This measure would constrain local governments' ability to impose fees, assessments, and taxes"]), "courts should exercise their independent judgment in reviewing whether assessments that local agencies impose violate article XIII D" (*Silicon Valley Taxpayers' Assn.*, at p. 450), instead of a deferential standard of review.

### 2. *The PBID Law and Implementation Act*

The PBID Law provides a framework for the establishment and operation of BIDs in this state. The statute reflects and furthers the Legislature's view that "[i]t is of particular local benefit to allow business districts to fund business related improvements, maintenance, and activities through the levy of assessments upon the businesses or real property that receive benefits from those improvements." (Sts. & Hy. Code, § 36601, subd. (c).) The "activities" contemplated by the PBID Law include, but are not limited to, the "[p]romotion of public events" and tourism within a district, "[f]urnishing of music in any public place," "[m]arketing and economic development," and "[p]roviding security, sanitation, graffiti removal, street and sidewalk cleaning, and other municipal services supplemental to those normally provided by the municipality." (Sts. & Hy. Code, § 36606, subds. (a), (b), (d), (e).) The "improvements" referenced by the law include, but again are not limited to, parking facilities, benches and kiosks, trash receptacles and public restrooms, lighting and heating facilities, decorations, parks, fountains, and planting areas. (Sts. & Hy. Code, § 36610.)

The process set out in the PBID Law for creating a BID begins with the submission of a written petition signed by property or business owners in the proposed district who would pay more than 50 percent of the assessments to be levied. (Sts. & Hy. Code, § 36621, subd. (a).) This petition must include a summary of the proposed BID's management district plan and an advisement explaining how the complete plan can be obtained. (*Id.*, subd. (b).) The full management district plan must contain information such as a description of the proposed BID's boundaries (Sts. & Hy. Code, § 36622, subd. (c)); the improvements, maintenance, and activities to be performed through the BID (*id.*, subd. (d)); the total amount proposed to be expended for these services for each year of the BID's operations (*id.*, subd. (e)); "[t]he proposed source or sources of financing [of the BID], including the proposed method and basis of levying the assessment in sufficient detail to allow each property or business owner to calculate the amount of the assessment to be levied against his or her property or business" (*id.*, subd. (f)); and "[a] list of the properties or businesses to be assessed, including the assessor's parcel numbers for properties to be assessed, and a statement of the method or methods by which the expenses of a district will be imposed upon benefited real property or businesses, in proportion to the benefit received by the property or business, to defray the cost thereof" (*id.*, subd. (k)(1)), among other details.

Upon receipt of this petition, a city council may adopt a resolution expressing an intention to form a BID. (Sts. & Hy. Code, § 36621, subd. (a).) This resolution is to contain information concerning the BID proposal that is sufficient to "enable an owner to generally identify the nature and extent of the improvements, maintenance, and activities [of the BID], and

13

the location and extent of the proposed district." (*Id.*, subd. (c)(1).)

The PBID Law provides for a noticed hearing on a BID proposal, the time and place of which are to be provided in the resolution described above. (Sts. & Hy. Code, § 36621, subd. (c)(2).) Section 36623, subdivision (a) of this statute provides that when a BID proposal involves a new or increased property assessment, the prehearing and hearing procedures set out in the Implementation Act (Gov. Code, § 53753) come into play. Many of these procedures elaborate upon Proposition 218's specifications, including the Implementation Act's requirement of individualized advanced notice to those who would be subject to a proposed assessment and its description of the information and instructions this notice and the accompanying ballot are to provide. (Gov. Code, § 53753, subds. (b), (c).) Section 53753, subdivision (d) of the Government Code states further that at the public hearing on a proposed assessment, "the agency shall consider all objections or protests, if any, to the proposed assessment. At the public hearing, any person shall be permitted to present written or oral testimony. The public hearing may be continued from time to time."

The PBID Law explains what is to follow: "At the conclusion of the public hearing to establish the district, the city council may adopt, revise, change, reduce, or modify the proposed assessment or the type or types of improvements, maintenance, and activities to be funded with the revenues from the assessments. Proposed assessments may only be revised by reducing any or all of them. At the public hearing, the city council may only make changes in, to, or from the boundaries of the proposed property and business improvement district that will exclude territory that will not benefit from the proposed

improvements, maintenance, and activities." (Sts. & Hy. Code, § 36624.) "If the city council, following the public hearing, decides to establish a proposed property and business improvement district, the city council shall adopt a resolution of formation that shall include, but is not limited to" (Sts. & Hy. Code, § 36625, subd. (a)) information such as "[a] brief description of the proposed improvements, maintenance, and activities, the amount of the proposed assessment, a statement as to whether the assessment will be levied on property, businesses, or both within the district, a statement on whether bonds will be issued, and a description of the exterior boundaries of the proposed district" (*id.*, subd. (a)(1)). The city must also render "[a] determination regarding any protests received," and "shall not establish the district or levy assessments if a majority protest was received." (*Id.*, subd. (a)(4).)

## B. Exhaustion of Remedies

### 1. General Principles

As a general rule, " 'a party must exhaust administrative remedies before resorting to the courts. [Citations.] Under this rule, an administrative remedy is exhausted only upon "termination of all available, nonduplicative administrative review procedures." ' " (*Plantier*, *supra*, 7 Cal.5th at p. 382.) An exhaustion rule is perhaps most closely associated with quasi-adjudicative actions taken by administrative agencies, but the doctrine is not strictly limited to that context.[5]

---

[5] A quasi-adjudicative or quasi-judicial act by a nonjudicial entity has been described as an act that " 'involve[s] the determination and application of facts peculiar to an individual case,' " whereas a legislative or quasi-legislative act " 'involve[s] the adoption of rules of general application on the basis of broad

Some statutes expressly require the exhaustion of an extrajudicial procedure as a prerequisite to presenting a claim in court. (E.g., Gov. Code, § 65009, subd. (b)(1) [exhaustion requirement for challenges to zoning decisions]; Pub. Resources Code, § 21177, subd. (a) [exhaustion requirement under the California Environmental Quality Act]; Sts. & Hy. Code, § 5366 [exhaustion requirement under the Improvement Act of 1911]; cf. Lubbers, *Fail to Comment at Your Own Risk: Does Issue Exhaustion Have a Place in Judicial Review of Rules?* (2018) 70 Admin. L.Rev. 109, 114–118 (Lubbers) [listing federal statutes requiring exhaustion].)

In appropriate circumstances, we also have inferred an exhaustion requirement in statutory and regulatory schemes that do not contain any express command that available administrative procedures be engaged before relief may be sought in court. (E.g., *Flores v. Los Angeles Turf Club* (1961) 55 Cal.2d 736, 746–747 (*Flores*).) In deciding whether to draw such an inference, we give due consideration to the extrajudicial procedures involved and to whether recognition of an exhaustion requirement "would comport with the statutory scheme and advance the general purposes served by the exhaustion rule."

public policy.'" (*Nasha v. City of Los Angeles* (2004) 125 Cal.App.4th 470, 482; see also *San Diego Bldg. Contractors Assn. v. City Council* (1974) 13 Cal.3d 205, 212 & fn. 5 [discussing legislative and adjudicative acts, and providing examples of both]; *Howard v. County of San Diego* (2010) 184 Cal.App.4th 1422, 1431–1432 (*Howard*) [describing "[l]egislative actions" as "political in nature, 'declar[ing] a public purpose and mak[ing] provisions for the ways and means of its accomplishment,'" as contrasted with "administrative or adjudicative actions," which "apply law that already exists to determine 'specific rights based upon specific facts ascertained from evidence adduced at a hearing'"].)

(*Williams & Fickett*, *supra*, 2 Cal.5th at p. 1274; see also *Flores*, at pp. 746–747.) This analysis also must recognize that when the Legislature has provided for an adequate remedy, "absent a clear indication of legislative intent, we should refrain from inferring a statutory exemption from our settled rule requiring exhaustion of administrative remedies." (*Campbell v. Regents of University of California* (2005) 35 Cal.4th 311, 333 (*Campbell*).)

Several rationales exist for requiring exhaustion of an available administrative remedy even in the absence of an explicit directive that this process be completed prior to the commencement of a judicial proceeding. Requiring initial resort to an administrative procedure in such situations can be understood as vindicating legislative intent to provide another avenue for resolving disputes, which might be frustrated if that mechanism could be routinely avoided. The exhaustion doctrine also recognizes and gives due respect to the autonomy of the executive and legislative branches, and can secure the benefit of agency expertise, mitigate damages, relieve burdens that might otherwise be imposed on the court system, and promote the development of a robust record conducive to meaningful judicial review. (See *Plantier*, *supra*, 7 Cal.5th at p. 383; *Williams & Fickett*, *supra*, 2 Cal.5th at p. 1268; *Farmers Ins. Exchange v. Superior Court* (1992) 2 Cal.4th 377, 391; *Rojo v. Kliger* (1990) 52 Cal.3d 65, 86 (*Rojo*); *Westlake Community Hosp. v. Superior Court* (1976) 17 Cal.3d 465, 476 (*Westlake Community Hosp.*).) Additionally, absent an exhaustion rule, a litigant might have an incentive to "sandbag" — in other words, to "avoid securing an agency decision that might later be afforded deference" by sidestepping an available administrative remedy. (*Plantier*, at p. 383.)

In concluding that petitioners' votes against the BIDs were insufficient to preserve their arguments regarding the invalidity of the assessments (*Hill RHF*, *supra*, 51 Cal.App.5th at p. 634), the Court of Appeal applied a branch of the exhaustion doctrine known as issue exhaustion. Issue exhaustion means that "[a]dministrative agencies must be given the opportunity to reach a reasoned and final conclusion on *each and every issue* upon which they have jurisdiction to act before those issues are raised in a judicial forum." (*Sierra Club v. San Joaquin Local Agency Formation Com.* (1999) 21 Cal.4th 489, 510, italics added (*Sierra Club*).) This doctrine bears some resemblance to the judicial rule that an argument that was not presented to a lower tribunal will not be entertained by a reviewing court. (See *Sims v. Apfel* (2000) 530 U.S. 103, 108–109 (plur. opn. of Thomas, J.).) When it applies, an issue exhaustion requirement advances the general purposes of the exhaustion rule by, among other things, discouraging the presentation of skimpy " 'skeleton' " arguments to an administrative agency. (*Dare v. Bd. of Medical Examiners* (1943) 21 Cal.2d 790, 799.)

There are important limits to the exhaustion doctrine. Among them, we have declined to impose an exhaustion requirement when a purported administrative remedy did not incorporate "clearly defined machinery for the submission, evaluation and resolution of complaints by aggrieved parties." (*Rosenfield*, *supra*, 65 Cal.2d at p. 566; see also *Endler v. Schutzbank* (1968) 68 Cal.2d 162, 168.) In other words, unless there is clear legislative direction to the contrary, a process proffered as an administrative remedy does not have to be exhausted when its dispute resolution procedures are so meager that it cannot fairly be regarded as a remedy at all. (But cf.

*Campbell*, *supra*, 35 Cal.4th at pp. 323, 333 [requiring exhaustion notwithstanding the unavailability of money damages through an administrative remedy]; *Westlake Community Hosp.*, *supra*, 17 Cal.3d at p. 476.) When the relevant extrajudicial procedures are so clearly wanting, the exhaustion rule does not come into play because it has been determined there is no genuine remedy to exhaust.

There are also several true exceptions to the exhaustion rule. (*Williams & Fickett*, *supra*, 2 Cal.5th at p. 1274.) We have described these exceptions as "flexible." (*Campbell*, *supra*, 35 Cal.4th at p. 322; see also *Sail'er Inn, Inc. v. Kirby* (1971) 5 Cal.3d 1, 7 [declining to require exhaustion due to "extraordinary circumstances"].) One exception applies when the claimed remedy might involve "clearly defined machinery for the submission, evaluation and resolution" of at least some "complaints by aggrieved parties" (*Rosenfield*, *supra*, 65 Cal.2d at p. 566), but these procedures are deemed inadequate in relation to the specific claim or claims being advanced in a particular case. (See *Plantier*, *supra*, 7 Cal.5th at pp. 384, 387.) This analytical path is narrower than a finding of categorical deficiency. A court may regard a given extrajudicial procedure as insufficient to justify application of the exhaustion rule in a particular case, or class of cases, without going further and determining whether the process can *ever* be regarded as an administrative remedy. Our recent decision in *Plantier*, which will be discussed in the next portion of this opinion, provides an example of this approach. (*Plantier*, at pp. 383–387.)

### 2. *The Exhaustion Doctrine and Opportunities to Comment*

Our prior case law has noted exhaustion issues similar to the question presented here, only to leave them for another day. In a matter decided prior to Proposition 218, we assumed for sake of argument that a judicial action challenging a property assessment as invalid under Proposition 13 was not foreclosed by the petitioners' failure to raise their objections at an earlier public hearing convened by the city (the exhaustion issue not having been addressed by the courts below). (*Knox v. City of Orland* (1992) 4 Cal.4th 132, 148 & fn. 22 (*Knox*), superseded by constitutional amendment as noted in *Silicon Valley Taxpayers' Assn.*, *supra*, 44 Cal.4th at p. 446.) More recently, in *Plantier*, *supra*, 7 Cal.5th 372, we assumed for purposes of our analysis that a local water district's rate hearing under section 6 of Proposition 218 (art. XIII D, § 6) was an administrative remedy, because that was how the parties and the lower courts had framed the issue presented for our review. (*Plantier*, at pp. 383–384.) But in determining in *Plantier* that a courtroom challenge to the methodology through which user fees were calculated by a water district was not barred by the exhaustion doctrine for failure to raise this objection at a public hearing convened to consider only a proposed increase in existing rates (*id.*, at pp. 384–387), we made it clear that we were not deciding the "broader question of whether, when, and under what circumstances a public comment process may be considered an administrative remedy" (*id.*, at p. 384).[6]

---

[6] It is also not firmly established how issue exhaustion relates to the opportunity to comment on proposed regulations that are subject to the provisions of the Administrative

Outside of the assessment context, some decisions by the Courts of Appeal have rejected arguments that an issue or objection had to be articulated during a public comment session to be preserved for presentation in a subsequent judicial proceeding. The respondent in *Lindelli v. Town of San Anselmo* (2003) 111 Cal.App.4th 1099 (*Lindelli*), for example, asserted that the petitioners had failed to exhaust their administrative remedies because they did not raise their objection to a proposed municipal contract at the city council's public hearing on the agreement. (*Id.*, at p. 1105.) The Court of Appeal determined that the exhaustion doctrine did not apply to the circumstances before it, concluding instead that "[t]he opportunity to participate in a public hearing prior to a legislative action does not constitute an administrative remedy subject to exhaustion." (*Ibid.*) In regarding the opportunity to offer public comment before lawmakers as an insufficient premise for inferring an exhaustion requirement, the *Lindelli* court emphasized that the "city council was not required to do anything in response to [this] participation." (*Id.*, at p. 1106; see also *Howard*, *supra*,

---

Procedure Act (Gov. Code, § 11340 et seq.). (See Gov. Code, §§ 11346.5, subd. (a)(15), (17), 11346.8, 11346.9, subd. (a)(3); *Coastside Fishing Club v. California Fish & Game Com.* (2013) 215 Cal.App.4th 397, 415 ["We have found no authority for the proposition that the public comment and response-to-comment requirements of the [Administrative Procedure Act] constitute an administrative remedy that must be exhausted before challenging the validity of an administrative regulation in a judicial action or proceeding"]; Asimow et al., Cal. Practice Guide: Administrative Law (The Rutter Group 2020) ¶ 15.540; cf. Lubbers, *supra*, 70 Admin. L.Rev. at pp. 136–142, 144–149 [discussing the application of the issue exhaustion doctrine in challenges to federal regulations brought in federal court].) We express no opinion here regarding this distinct issue.

184 Cal.App.4th at p. 1432; *Hoffman Street, LLC v. City of West Hollywood* (2009) 179 Cal.App.4th 754, 769, fn. 8; *City of Coachella v. Riverside County Airport Land Use Com.* (1989) 210 Cal.App.3d 1277, 1287 (*City of Coachella*) ["An administrative remedy is provided only in those instances where the administrative body is required to actually accept, evaluate and resolve disputes or complaints"].)

### C. Issue Exhaustion Does Not Apply Here

This matter concerns an assessment rather than a fee, but otherwise picks up where our decision in *Plantier* left off. Although *Plantier* involved a related exhaustion issue, its analysis is not determinative of the outcome here. There was a clear misfit between the procedure in *Plantier* and the arguments being advanced by the petitioner in that case. Here, it seems possible that had the City Council heard petitioners' objections to the BIDs at the appropriate public hearings, that body could have removed their properties from the districts, decided not to renew the BIDs, maintained the arrangements provided for in the 2013 settlement agreements, or otherwise afforded petitioners relief that might have averted these proceedings. Our analysis therefore must proceed on a somewhat different plane from the one on which *Plantier* was decided.

### *1. Provision of an Opportunity to Comment on a BID Does Not Convey an Issue Exhaustion Requirement*

We begin our assessment of the constitutional and statutory scheme by recognizing that the relevant provisions of Proposition 218 and the surrounding statutes do not explicitly limit judicial actions to issues previously presented to an agency in the same way that certain other laws do. But, again, the

absence of such language is not determinative of the exhaustion question. If there is a viable remedy, we may infer an exhaustion requirement not appearing on the face of a statute upon appropriate consideration of whether such an inference "would comport with the statutory scheme and advance the general purposes served by the exhaustion rule." (*Williams & Fickett*, *supra*, 2 Cal.5th at p. 1274.)

We therefore focus, first, upon the basic nature of the purported remedy — a noticed opportunity to participate in a public comment session concerning a proposed legislative act under consideration by local officials. If this chance to comment amounts to "clearly defined machinery for the submission, evaluation and resolution of complaints" (*Rosenfield*, *supra*, 65 Cal.2d at p. 566), it could convey (as the Court of Appeal below found) an implied intent that objections be presented to the relevant agency before they can be advanced in court. But as we will explain, it is difficult to assign such significance to the modest "machinery" (*ibid.*) that is involved here.

The "machinery" associated with the public comment process before us is not as suggestive of a scheme purposed for "the submission, evaluation and resolution of complaints" (*Rosenfield*, *supra*, 65 Cal.2d at p. 566) as were the procedures in prior cases in which we have recognized an intent to require exhaustion. In *Williams & Fickett*, *supra*, 2 Cal.5th 1258, for example, the assessment appeal process could include an evidentiary hearing, exchanges of information between the taxpayer and the government, examinations under oath, and the collection and introduction of evidence. (*Id.*, at p. 1269, citing Rev. & Tax. Code, §§ 1603, 1605.4, 1605.6, 1606, 1607, 1609, 1609.4, 1609.5, 1610.2.) These relatively robust procedures, together with another aspect of the statutory

scheme (to wit, an administrative stipulation process) communicating an expectation that claims such as the ones we addressed had to be presented to the administrative body in the first instance, supported our conclusion that an exhaustion requirement was intended. (*Williams & Fickett*, 2 Cal.5th at pp. 1269–1272; see also *Flores*, *supra*, 55 Cal.2d at p. 746 [inferring an intent to require exhaustion from a "pervasive . . . system of administrative procedure"]; *San Joaquin etc. Irr. Co. v. Stanislaus* (1908) 155 Cal. 21, 26–29 [inferring an exhaustion requirement from a statutory petition process that, when initiated, would trigger renewed ratemaking].) The full array of procedures involved in *Williams & Fickett* may not all be necessary to find that a remedy exists and must be exhausted prior to suit. But the significant gap between the procedures involved here and those present in *Williams & Fickett* and other cases in which an exhaustion requirement has been inferred provides an indication that the public comment process we are concerned with was not intended to give rise to a broad issue exhaustion requirement, and should not be regarded as having that effect.

Perhaps most notably, a public comment session concerning a proposed legislative act, without more, is not obviously geared toward the "resolution" of objections such as those raised by petitioners. (*Rosenfield*, *supra*, 65 Cal.2d at p. 566.) In arguing the opposite, respondents assert that the requirement within Proposition 218 that an agency consider all "protests" (art. XIII D, § 4, subd. (e)) provides sufficient assurance that objections to BIDs will be resolved through the application of agency expertise. Their argument proceeds from the position that although the proposition refers only to "protests," the consideration requirement naturally extends to

objections that may be articulated at the hearing, too, as more clearly captured by Implementation Act's specification that at the hearing on a BID, "any person shall be permitted to present written or oral testimony" and the agency "shall consider all objections or protests, if any, to the proposed assessment." (Gov. Code, § 53753, subd. (d).)

As a threshold matter, we agree with respondents' interpretation of section 4 of Proposition 218 and section 53753, subdivision (d) of the Government Code as requiring consideration of both protest votes and any oral and written objections presented at the hearing on an assessment. This construction is in harmony with our interpretation of section 6 of Proposition 218 in *Plantier, supra*, 7 Cal.5th 372. There, we determined that "[t]he requirement to 'consider all protests' (art. XIII D, § 6, subd. (a)(2)) at a Proposition 218 hearing compels an agency to not only receive written protests and hear oral ones, but to take all protests into account when deciding whether to approve the proposed fee, even if the written protesters do not constitute a majority." (*Plantier*, at p. 386.)

Yet even if respondents are correct in this one respect, that does not settle the more fundamental question of whether the process here had to be exhausted through the presentation of specific objections at the appropriate public hearing. On this issue, we find it significant that a requirement that objections be *considered*, by itself, places no legal obligation upon an agency to actually *respond* to whatever comments it might receive. (See *Lindelli, supra*, 111 Cal.App.4th at p. 1106; *City of Coachella, supra*, 210 Cal.App.3d at p. 1287.) And as we explained in *Plantier, supra*, 7 Cal.5th at page 386, "nothing in Proposition 218 or the legislation implementing it defines *what level* of consideration must be given" to these protests. (Italics

added.)  If anything, Proposition 218's specification that protests are to be considered "[a]t the public hearing" (art. XIII D, § 4, subd. (e)) suggests that the voters did not expect especially careful parsing of any detailed critiques that might be presented in that setting.  (See *Plantier*, at p. 386.)  Lacking more, the requirement within the constitutional and statutory scheme that objections to a BID be considered by an agency at the appropriate hearing does not involve "clearly defined machinery" conducive to the "resolution of complaints" (*Rosenfield, supra,* 65 Cal.2d at p. 566) comparable to that which has in other instances provided a sufficient basis for recognizing an exhaustion requirement.[7]

Nor is there good reason to infer that the electorate and lawmakers regarded the noticed opportunity to participate in a public comment session regarding a proposed BID as a procedure that must be exhausted, notwithstanding this

---

[7]  As has been observed, the PBID Law provides that a city must make "[a] determination regarding any protests received" at the conclusion of the public hearing on a BID, and further specifies that "[t]he city shall not establish the district or levy assessments if a majority protest was received."  (Sts. & Hy. Code, § 36625, subd. (a)(4).)  We read this provision, which was added to the PBID Law in response to Proposition 218 (Stats. 1999, ch. 871, § 6, p. 6237) as requiring a finding concerning the existence or absence of a majority protest — the "protests" referred to in the subdivision's first clause being the ballots that could sum to a majority protest, as referenced in the provision's second clause — not a response to any specific objections that may be raised incident to the public hearing on a BID.  This language differs from the phrasing within Proposition 218 (art. XIII D, §§ 4, subd. (e), 6, subd. (a)(2)), in which the requirement that an agency "consider" all protests carries meaning above and beyond a tabulation requirement.  (See *Plantier, supra,* 7 Cal.5th at pp. 385–386.)

process's limitations as an avenue for the "submission, evaluation and resolution of complaints." (*Rosenfield*, *supra*, 65 Cal.2d at p. 566.) Unlike the situation in *Williams & Fickett*, *supra*, 2 Cal.5th 1258, the constitutional and statutory scheme we address here includes nothing that implicitly conveys an expectation that exhaustion must occur. Nor is there any shared understanding that the opportunity to appear before decisionmakers as an interested member of the public to praise and encourage — or critique and condemn — a proposed legislative act, a basic feature of representative democracy in this state (see, e.g., Gov. Code, § 54954.3), inherently carries a preclusive edge and must in the normal course be fully exploited in order to preserve objections for a later lawsuit.

It follows from the above that we cannot readily infer an intent that the public comment process set out in Proposition 218 and the relevant statutes should give rise to an issue exhaustion requirement. If anything, the limited nature of the procedures involved here points toward the opposite conclusion: that objections to a BID proposal such as those raised by petitioners need not be articulated at the appropriate public hearing as a prerequisite to their becoming the subjects of suit. And if we were to assume this appraisal of the public comment process is not by itself determinative of the question before us, as will be explained next, the pertinent circumstances cement the outcome insofar as they provide no compelling policy arguments for imposing an issue exhaustion rule in this context.

### 2. *The Policy Rationales for Requiring Issue Exhaustion Are Not Compelling Here*

We now consider whether recognition of an issue exhaustion requirement here would "advance the general

27

purposes served by the exhaustion rule." (*Williams & Fickett*, *supra*, 2 Cal.5th at p. 1274.) We conclude that the limitations of the procedures we are concerned with, as well as other relevant circumstances, reduce the potency of various policy justifications for requiring exhaustion, so that these arguments carry less force than they have in other situations in which an exhaustion requirement has been inferred.

Specifically, we have explained that exhaustion of an administrative remedy can promote the development of a record suitable for judicial review. (E.g., *Westlake Community Hosp.*, *supra*, 17 Cal.3d at p. 476.) With or without public comments, however, as previously discussed the PBID Law requires the preparation of a comprehensive management district plan (Sts. & Hy. Code, § 36622) and Proposition 218 directs that all assessments covered by the initiative also "be supported by a detailed engineer's report" (art. XIII D, § 4, subd. (b); see also Sts. & Hy. Code, § 36622, subd. (n)). These documents may by themselves provide a substantial record for purposes of judicial review. Meanwhile, the absence of any requirement that an agency actually respond to objections articulated at a public hearing on a BID proposal calls into question whether an exhaustion rule would routinely lead to better developed records and the application of agency expertise (see *Rojo*, *supra*, 52 Cal.3d at p. 86; *Westlake Community Hosp.*, at p. 476), and likely reduces the comment process's effectiveness as a vehicle for resolving disputes short of judicial involvement (see Friendly, *"Some Kind of Hearing"* (1975) 123 U.Pa. L.Rev. 1267, 1292 [discussing how statements of reasons may alleviate concerns regarding a decision or ruling]).

Other circumstances relevant to these proceedings also function to blunt policy arguments that have in other situations

supported recognition of an exhaustion requirement. Although the exhaustion rule can serve to mitigate damages and disruption by requiring the prompt presentation of objections to an agency (*Westlake Community Hosp.*, *supra*, 17 Cal.3d at p. 476), the 30-day deadline for challenging an assessment set out in section 36633 of the Streets and Highways Code, which petitioners complied with, can have a similar effect. Furthermore, when it is alleged that an agency has not met its burdens under section 4, subdivision (f) of the initiative (art. XIII D, § 4, subd. (f)), the application of an independent judgment standard of review to such claims (*Silicon Valley Taxpayers' Assn.*, *supra*, 44 Cal.4th at p. 450) mitigates the common concern that a litigant will avoid an administrative remedy so as not to elicit a factual finding that would receive deference upon judicial review.

All this is not to say that a rule requiring the presentation of specific objections regarding a BID to an agency at the appropriate public hearing certainly would have no value whatsoever as applied to disputes such as those at bar. As respondents argue, the precise articulation of concerns regarding a BID proposal at that juncture could lead to fixes, compromises, or explanations that might avoid, expedite, or enhance subsequent litigation. But the exhaustion doctrine does not apply in every situation in which an abstract possibility exists that an objection lodged through some channel will alter or otherwise affect an agency action. (See *Sierra Club*, *supra*, 21 Cal.4th at p. 502 [exhaustion does not require a petition seeking reconsideration of a decision by an administrative agency, even though a petition might give an agency an opportunity to address a prior error]; *Rosenfield*, *supra*, 65 Cal.2d at p. 566 [observing that an agency's possession of

ongoing supervisory or investigatory power does not on its own trigger an exhaustion requirement].) Whatever likelihood there may be that an exhaustion requirement could avert litigation such as that before us, or have other useful consequences, it is more significant to the legal question we address that the overall array of benefits likely to flow from such a directive here is both more modest and more speculative than has ordinarily been the case in situations in which we have foreclosed a claim or lawsuit due to a party's failure to exploit an extrajudicial remedy.

### 3. Not Requiring Exhaustion Comports with Proposition 218

Although this matter might be resolved on the basis of the foregoing considerations, we also observe that a conclusion that issue exhaustion does not apply here is in synch with our previously articulated understanding of Proposition 218's aims. With the initiative having the goal of facilitating challenges to assessments, this would be odd terrain in which to expand the exhaustion doctrine by regarding a public comment process such as the one before us as an adequate remedy that must be exhausted prior to suit, especially when there are no especially compelling policy justifications for doing so.[8]

As we explained in *Silicon Valley Taxpayers' Assn.*, *supra*, 44 Cal.4th 431, "[i]n passing Proposition 218, the voters clearly sought to limit local government's ability to exact revenue under the rubric of special assessments" (*id.*, at p. 446), and toward this end, the proposition was intended to make it "more difficult

---

[8] Given the other considerations behind our holding, we need not decide whether an exhaustion requirement of some kind could be reconciled with Proposition 218 under materially different circumstances.

for an assessment to be validated in a court proceeding" (*id.*, at p. 445). (See also *id.*, at p. 448.) And as previously described in this opinion, we held in *Silicon Valley Taxpayers' Assn.* that to stay true to the proposition's intent, courts must apply their independent judgment when determining whether an agency has met the burdens assigned to it by section 4, subdivision (f) of the initiative (art. XIII D, § 4, subd. (f)) — a substantially less deferential standard than the one we had applied in *Knox*, *supra*, 4 Cal.4th at pages 146–149. (*Silicon Valley Taxpayers' Assn.*, at p. 450.)

Having so construed the measure, it would be somewhat curious for us to now adopt an expansive view of issue exhaustion in this context. Such a rule would resolve an issue we left open in *Knox*, *supra*, 4 Cal.4th at page 148 — a decision the proposition countermanded because of the deference it extended to assessment schemes — in a manner adverse to challenges to assessments covered by the initiative. An insistence on issue exhaustion here could have important consequences, too. We question the Court of Appeal's downplaying of the burdens attendant to "submitting a ballot opposing the assessment and presenting to the agency at the designated public hearing the specific reasons for [an] objection to the establishment of a BID in a manner the agency can consider and either incorporate into its decision or decline to act on." (*Hill RHF*, *supra*, 51 Cal.App.5th at p. 634.) The development and presentation of "specific reasons for [an]

objection" (*ibid*.) at the appropriate hearing may be far easier said than done.[9]

### 4. *Conclusion*

To summarize, the opportunity to participate in a public comment session regarding a BID proposal does not involve procedures conducive to the "submission, evaluation," and especially the "resolution" of disputes (*Rosenfield, supra*, 65 Cal.2d at p. 566) comparable to those that are commonly found in administrative remedies that must be exhausted; the policy arguments for recognizing an exhaustion requirement do not carry great force here; and declining to require exhaustion creates no tension with our previously articulated understanding of Proposition 218's goals. The purported remedy here is just too thin, and the policy justifications for demanding exhaustion too weak, to insist that petitioners have presented their objections as public comments in order to secure their evaluation in court. We therefore conclude that the Court of Appeal erred in rejecting petitioners' appeal on the ground they had not exhausted their administrative remedies.

---

[9] Respondents contend it would be consistent with the intent behind Proposition 218 to require exhaustion here. Respondents assert that enforcement of an exhaustion requirement would enhance public discussions of assessments and afford those who support a levy an expanded opportunity to address objections voiced at these hearings. Without entirely gainsaying these objectives, as guideposts for discerning and implementing the electorate's intent they do not carry the same weight as the proposition's provisions and its goal of limiting assessments, as detailed in the main text.

### D. Other Arguments Advanced by Respondents and Amici Curiae Do Not Justify an Exhaustion Requirement

Respondents and their supporting amici curiae (the League of California Cities, the Association of California Water Agencies, the California State Association of Counties, and the California Special Districts Association) advance other reasons why issue exhaustion should apply here, but none of these arguments supplies a persuasive basis for adopting their position.

Beginning with the text of Proposition 218 and the Implementation Act, respondents argue that it would give short shrift to the provisions therein that protests and objections may be raised and shall be "consider[ed]" (art. XIII D, § 4, subd. (e); Gov. Code, § 53753, subd. (d)) at the public hearing on a BID if objectors could just ignore the hearing and proceed directly to court if the BID is approved. But our holding does not transform these provisions into nullities. There are good reasons why property owners might raise their complaints at the appropriate hearings, and why agencies are bound to consider these objections when made, even if the articulation of issues at these forums is not an absolute prerequisite for their subsequent presentation in court. As has been acknowledged, such engagement conceivably could secure protesters relief and resolve a brewing dispute, and for that reason and others might be encouraged and facilitated under the law even if exhaustion is not required. Notably, some objections to a BID may not lend themselves to a courtroom challenge, meaning they may gain traction only at the public hearing. Testimony that proposed assessments would be financially onerous to property owners, for instance, might persuade an agency to reject or revise a BID

33

proposal even if these same arguments would not provide a viable basis for attacking the BID as unlawful.

Next, respondents and their supporting amici curiae assert that an issue exhaustion requirement must apply here because that is the only way to adhere to the rule that judicial review is generally limited to the administrative record in mandate proceedings brought to challenge a quasi-legislative action by an agency. (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 573 (*Western States*); *Ford Dealers Assn. v. Department of Motor Vehicles* (1982) 32 Cal.3d 347, 365, fn. 11.) If parties could sue upon unexhausted objections to an assessment, the argument goes, they would have to rely on facts outside the record to develop their claims, and the agency named as a respondent would have to do likewise to rebut these contentions.

We do not find this argument persuasive. There may be additional grounds upon which to critique respondents' assertion (see *Malott v. Summerland Sanitary Dist.* (2020) 55 Cal.App.5th 1102, 1110–1111 [allowing the plaintiff in an administrative mandamus challenge to an assessment under Proposition 218 to submit evidence not previously presented to the responsible agency]), but it suffices here to observe, first, that there is no necessary congruence between *issue* exhaustion and a rule limiting judicial review to *evidence* in the administrative record. In *Knox, supra,* 4 Cal.4th at pages 147–148, for example, we entertained arguments that were not known to have been presented to the respondent government entity, but in doing so, we considered only evidence found in the administrative record, as well as judicially noticeable facts. What is more, *Western States, supra,* 9 Cal.4th 559 addressed challenges to agency action as either unsupported by

substantial evidence in the record, an abuse of discretion, or arbitrary and capricious; we concluded that to allow extra-record evidence in support of such claims would be contrary to the deference associated with these standards of review. (*Id.*, at pp. 573, 574, 576.) Under Proposition 218, in contrast, as we have already emphasized in this opinion the *agency* must "demonstrate that the property or properties in question receive a special benefit over and above the benefits conferred on the public at large and that the amount of any contested assessment is proportional to, and no greater than, the benefits conferred on the property or properties in question" (art. XIII D, § 4, subd. (f)), and courts are to exercise their independent judgment in determining whether this demonstration has been made (*Silicon Valley Taxpayers' Assn.*, *supra*, 44 Cal.4th at p. 450). The interest in extending due deference to agency determinations that informed the analysis in *Western States* does not carry the same weight with regard to these kinds of claims under the proposition.

Respondents and amici curiae also rely upon cases in which the seizure of an opportunity to raise objections at a public hearing was regarded as necessary to preserve an issue for judicial review. Those cases are distinguishable, however, with only three meriting significant discussion. In *Wallich's Ranch Co. v. Kern County Citrus Pest Control Dist.* (2001) 87 Cal.App.4th 878 (*Wallich's Ranch*), the Court of Appeal construed the Citrus Pest District Control Law (Food & Agr. Code, § 8401 et seq.; hereinafter referred to as the Pest Control Law), relevant provisions of which (1) allow for the presentation of protests against a pest district's annual budget "or any item in it" at the hearing of the district's board of directors at which the budget is presented for consideration and approval (*id.*,

§ 8564), and (2) specify that "[a]t the time set for hearing protests [regarding the budget], the board shall proceed to hear and pass upon all protests so made and its decision on the protests shall be final and conclusive" (*id.*, § 8565). Addressing a grower's challenge to assessments imposed over a three-year span, which contributed to the district's budget over this period, the court in *Wallich's Ranch* determined that these objections should have been presented at the appropriate budget hearings, and the grower's failure to so object barred it from later challenging the assessments in court. (*Wallich's Ranch*, at pp. 884–885.)

The analysis in *Wallich's Ranch*, *supra*, 87 Cal.App.4th 878 relied upon the reasoning in *People ex rel. Lockyer v. Sun Pacific Farming Co.* (2000) 77 Cal.App.4th 619, 641–642 (*Sun Pacific*), in which the Court of Appeal upheld a trial court's refusal to allow the defendant in a nuisance proceeding to introduce evidence regarding the efficacy of a Pest Control Law abatement program because the defendant had not previously challenged the program at the appropriate annual budget hearings. *Sun Pacific* found the exhaustion rule applicable "[g]iven the public health and safety issues inherent in the Pest Control Law, in addition to the policy of resolving disputes expeditiously." (*Id.*, at p. 641.) This view was echoed by the *Wallich's Ranch* court (*Wallich's Ranch*, at p. 884), which also observed that raising appropriate objections to an assessment at the designated budget hearing gives a district "an opportunity to address the perceived problems and formulate a resolution" (*id.*, at p. 885).

In *Plantier*, *supra*, 7 Cal.5th 372, we found it unnecessary to decide whether *Wallich's Ranch* was correctly decided because we regarded that case as distinguishable on several

grounds. (*Plantier*, at p. 389 & fn. 12.) The same is true here. As we explained in *Plantier*, 7 Cal.5th at page 389, the statute addressed in *Wallich's Ranch* and *Sun Pacific* differs from the statutory and constitutional scheme before us in that the Pest Control Law directs local boards to "pass upon" objections (Food & Agr. Code, § 8565), not just "consider" protests (art. XIII D, § 4, subd. (e); Gov. Code, § 53753, subd. (d)). Moreover, neither *Sun Pacific* nor *Wallich's Ranch* considered whether the exhaustion requirement they read into the Pest Control Law comported with Proposition 218, or whether the opportunity to object under the Pest Control Law represented an adequate remedy under the standard announced in *Rosenfield*, *supra*, 65 Cal.2d at page 566. In light of the distinguishing characteristics of the statutory scheme addressed in *Sun Pacific* and *Wallich's Ranch* and the limited analysis within those opinions, we need not determine the correctness of those decisions in order to conclude that exhaustion through the presentation of specific objections at the BID hearings was not required here.

Finally, respondents also claim to find support for their position in *Roth v. City of Los Angeles* (1975) 53 Cal.App.3d 679 (*Roth*), but that case is likewise distinguishable. The plaintiffs in *Roth* owned certain real property in Los Angeles County. (*Id.*, at p. 682.) They were notified by authorities that vegetation on their property violated the municipal code, and that if they did not clear the brush themselves, penalties and other consequences might result. (*Ibid.*) When the plaintiffs did not respond, the Los Angeles City Council passed an ordinance pursuant to Government Code sections 39561 through 39563, declaring that weeds on specified properties, including the plaintiffs', constituted a public nuisance that the city intended

to abate. (*Roth*, at p. 682.) Notice of this ordinance and an opportunity to object at an upcoming city council meeting was sent to the plaintiffs. (*Id*., at p. 683.) The plaintiffs did not attend the designated meeting, at which the city council was required by statute not only to "hear and consider all objections to the proposed removal" (Gov. Code, § 39568) but also to "[b]y motion or resolution at the conclusion of the hearing . . . allow or overrule any objections" (Gov. Code, § 39569) before proceeding further. (*Roth*, at p. 683.) At the conclusion of this hearing, the city council adopted another ordinance that ordered the abatement of the nuisance on the plaintiffs' property. (*Ibid*.) After being assessed for the costs of the abatement, the plaintiffs brought suit, alleging that the statutory procedure violated due process. (*Ibid*.)

The Court of Appeal in *Roth, supra*, 53 Cal.App.3d 679 determined that the plaintiffs' "failure to exhaust their administrative remedy through the city council hearing [was] fatal to their attack on the abatement procedure." (*Id*., at p. 692.) Here again, we need not decide whether this conclusion was correctly drawn, because aspects of the *Roth* case function to distinguish it from the situation here. In particular, the circumstances in *Roth* provided additional assurances that any objections to specific nuisance determinations would be evaluated and addressed by council members at the designated meeting. This meeting was squarely attuned to and designed to address these individualized objections, rather than being concerned with a more fundamental policy decision. Furthermore, similar to the Pest Control Law's specification that local boards are to "pass upon" protests (Food & Agr. Code, § 8565), the instruction within the statutory scheme involved in *Roth* that lawmakers were to "allow or overrule any objections"

(Gov. Code, § 39569) before ordering a nuisance abated encouraged the resolution of disputes through the hearing procedures and the development of an administrative record to a greater degree than can be said of the process involved here, which does not provide comparable direction to agencies.

## III. DISPOSITION

Petitioners did not have to articulate their objections to the BID assessment schemes at the public hearings before the City Council to subsequently present their arguments in these proceedings. We reverse the judgment below and remand for further proceedings consistent with our decision.


**CANTIL-SAKAUYE, C. J.**


**We Concur:**

**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**
**HALLER, J.***

_____

\*      Associate Justice of the Court of Appeal, Fourth Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Hill RHF Housing Partners, L.P. v. City of Los Angeles

_____

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 51 Cal.App.5th 621
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S263734
**Date Filed:** December 20, 2021

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Mitchell L. Beckloff

_____

**Counsel:**

Reuben Raucher & Blum, Timothy D. Reuben, Stephen L. Raucher and Michael T. Gluk for Plaintiffs and Appellants.

Eric J. Benink and Vincent D. Slavens for Benink & Slavens, LLP, as Amicus Curiae on behalf of Plaintiffs and Appellants.

Jonathan M. Coupal, Timothy A. Bittle and Laura E. Dougherty for Howard Jarvis Taxpayers Association as Amicus Curiae on behalf of Plaintiffs and Appellants.

Michael N. Feuer, City Attorney, Beverly A. Cook, Assistant City Attorney, and Daniel M. Whitley, Deputy City Attorney, for Defendant and Respondent City of Los Angeles.

Colantuono, Highsmith & Whatley, Michael G. Colantuono, Holly O. Whatley and Pamela K. Graham for Defendants and Respondents

Downtown Center Business Improvement District Management Corporation and San Pedro Property Owners Alliance.

Burke, Williams & Sorensen, Kevin D. Siegel and Tamar M. Burke for League of California Cities, Association of California Water Agencies, California State Association of Counties and California Special Districts Association as Amici Curiae on behalf of Defendants and Respondents.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Stephen L. Raucher
Reuben Raucher & Blum
12400 Wilshire Boulevard, Suite 800
Los Angeles, CA 90025
(310) 777-1990

Holly O. Whatley
Colantuono, Highsmith & Whatley
790 E. Colorado Boulevard, Suite 850
Pasadena, CA 91101
(213) 542-5704